on the first case, which is Hodges v. On the Move Ltd. v. Irish Dancing Teachers et al. And I see we have Mr. Finney for the appellants. I see you reserve three minutes for rebuttal. You can begin whenever you're ready. Good morning, Your Honors. And may it please the court. Do you want to move that, Mr. Finney? I don't want to use your timer. The court officer will help you with that. It could be Finnegan. That might be the highest. Yeah, that's fine. May it please the court, and thank you for your time this morning, Your Honors. This appeal raises two limited issues of law that are straightforward. The first issue of law is the issue of excessive publication. Excessive publication is a limitation on the common interest privilege that exists under New York law. This court, in a decision that is binding and is correct, eminently correct, is this court held in Konicoff, cited at page 35 of our opening brief, that the common interest privilege is only applied to communications that are published to an extremely limited, clearly defined group of private persons with an immediate relationship to the speaker. I'm curious what you would think, I know you're alleging that you've plausibly alleged excessive publication, but what wouldn't have been allowed within that privilege under these contexts? In other words, would it have been okay to publish that to any teacher or entity that was dealing with your clients if they would know about this allegation? Would that have been okay under New York law or not? Your Honor, interestingly, one of the original defendants in the case who settled out of the case when we filed the appeal was Ms. Lutland. She wrote a letter to the board, five-member board. She wrote a letter and she said, I heard this, that there was a text sent by this individual to young girls. She didn't have personal knowledge, but she sent the letter to the board. Now, she went one step too far when she also told someone who sold wigs at an Irish dance convention. But because she sent the letter to five people, if this was a law school exam, that probably would be a small enough group that on a 12B6- When you have an allegation of some type of sexually inappropriate communication, even while it's being investigated, wouldn't you, I could give you all sorts of examples, but you would want anybody who's dealing with that organization to know that there was at least an allegation so that they could be aware of that. You're suggesting it could only go to the board, but not to any teachers or other entities that were dealing with your client in the interim during the investigation? Your Honor, your question is a very good one because it addresses where on the spectrum, on a motion to dismiss versus a motion for summary judgment, where on the spectrum can a judge under Iqbal Twombly now take a case where it's been well pled that there was excessive publication to dozens of schools where my client didn't even teach? I saw that in your brief, but I looked back at the complaint, and it wasn't clear to me from the complaint. I know there were teachers from Delaware, Pennsylvania, New York, New Jersey, I guess, right? So you're suggesting that your client had no business with anybody in Delaware, for example? My client, there were 200 dance schools. There were 200 teachers in dozens of dance schools, and my client may have taught at 20 of them. But the point is that when you have a complaint that alleges expressly excessive publication and says that you renounce it without having any verification, and you also have to take into account, your Honor, if a janitor in a school, if Sally, a five-year-old, says I saw the janitor do something with a little boy, and she runs to a teacher, the teacher can tell the principal, maybe on a motion to dismiss, maybe if the teacher told five other teachers in a faculty lounge, maybe on a 12 to 6, under Iqbal Twombly, and before Iqbal Twombly, even that would be passed, a motion to dismiss. But if the teacher goes to the PTA meeting that night in front of 200 parents and says, John Doe, the janitor, we have a complaint that he touched little John's penis. I just wanted you to know, we all have a common interest because your children are going to be in the school with that janitor tomorrow. That's exactly why the common law has a bound. There's a bound. It's excessive publication, meaning that- You also allege that there was an open phone line, too? Yes. Yes, Your Honor. Who was on the open phone line, do you know? What's that? Who was on the open phone line? The open phone line was available to people in the Irish dance community, and one of the problems, that's why I need discovery. This communication was read out loud to literally hundreds of people, and what's interesting, moving a little bit to Malice, but it goes to, there is a reasonableness of the publication. So, for example, if he had gotten up and said, ask your girls if they received texts from anybody. We have a complaint that there was an inappropriate text by a teacher. Talk to your girls. Let us know immediately. We are investigating it. If that's what they had done, that would have been much more reasonable and bounded by the need. The case law that we cite, Your Honor, in our briefs shows that you have some flexibility with your common interest, but it should be reasonable in the context. And in all of the cases that we have cited, it's typically a management group, HR, fellow teachers in a synagogue. It was people at the synagogue. In one of the cases that the lower court cited, it was the basketball faculty. It was limited. I have a question about Malice. A lot of your allegations are geared towards the closing of the investigation by the IDT, ANA, and the criminal investigation being closed. But it does not appear that, well, the criminal investigation, you could still have sexually inappropriate behavior. That's not a crime. So their point is that doesn't necessarily mean they should believe that it didn't happen. And the organization letter was pretty clear that they were troubled by this, but said they had no jurisdiction because your client was not a member. So how does that demonstrate Malice? They changed the minutes. They fabricated the minutes. At the meeting, in the transcript, they read out the letter out loud, and they made it sound like it was currently under investigation, including criminal investigation. Then we have an audio recording of that. Then when they created the minutes, they added that the investigation was closed. The lower court judge incorrectly seized on the idea that, oh, just because it's not a crime doesn't mean that he didn't do it. But the fact is my client who's sitting there, whose reputation was destroyed, they never interviewed him. No investigation, no civil, administrative, no investigation occurred. They just dumped the accusation, let his career get ruined, and they never had an administrative proceeding or any interview or request for interview. They never did anything about that. They just destroyed his reputation in front of hundreds of people and then just said bye. That's the end. And the text message was never the allegedly inappropriate text message was not part of the communication complaint? The text message photo doesn't even have anything inappropriate on it. It just says that he allegedly deleted it because it was on Instagram. No one did an investigation. So in this case, also, he got an e-mail from the organization saying we're looking into this. And when he said, oh, I want to know what it's about, she said it's closed. She said it's closed. The investigation is closed when he asked what it was about. Can you imagine if in a bar association I received a complaint and I said, what's the complaint? Of course, they give you an opportunity. Can you imagine if they said it's closed and then at the New York State Bar Association they said, we heard that the councilor stole funds and mentioned my name in front of hundreds of people? For this to be dismissed on the 12B6- We're talking about hundreds of people. But this is going back to the excessive publication point, and that's my concern. My concern here is that the people who were there operated dance schools whose students were available to go to the camp, your client's camp. And the real question was, was this a safe, based on that information, on the information that they had at the time, was this a safe place for them to send their kids? And if not, then, and so therefore, wasn't it of concern and interest to everybody who was there, at least potentially? Because they could, and your client was looking to expand his business and keep things moving, because they could send kids there. Your Honor, it would have been completely appropriate. First of all, there were more schools on that phone than my client ever taught at. Secondly, there was no substantiation- Why was he ever taught at? What does that mean? But they might potentially go there afterwards, whether he taught or not at those schools, because he was running a camp that people could send their kids to. No, that's not true. First of all, my client only taught at a limited number of the schools. He only had a camp that dealt with a certain number of those schools. It's not true at all that everybody on that- And he wasn't looking to have any other schools join the camp in the future. What's that? Was he looking to expand his business to get other camps, other schools, to join his camp? Your Honor, under that line of questioning, anybody in business who's looking to expand, that means that someone can read out loud an unsubstantiated defamatory statement to anybody who you might do business with and claim that there's a common interest in spreading the defamatory information rather than having a more limited investigation. We're talking about kids sending young girls off to camp in the future. And I don't understand, I don't see the logic of whether it's 200 people, if they all have a common interest, 200 people versus 5 people or 20 people or 50 people. What's- There was absolutely no allegation that my client did anything inappropriate in his role as a teacher. There was an allegation that he sent an inappropriate text message to two young girls. There was no connection to his role as a teacher, his acting as a teacher. And if it- If it were true, I'm not saying anything about that. If it were true, wouldn't that be something that everybody who was there would be interested in knowing about? It would be- So they could make a judgment. Under that theory, then if the janitor is accused, you can tell 200 people at the PTA meeting at night under your logic. I respectfully disagree, Your Honor. And also, this is Iqbal Twombly. This is Iqbal gone rogue. I need discovery. I need to see who was on that phone call. I need to know why they told him the investigation was closed and didn't listen to his- He wanted to tell his version of the story. So this is Iqbal. Respectfully, Your Honor, it's Iqbal gone wild. I need some discovery here. It's not fair. All right, thank you. Thank you. Reserved three minutes. Good morning, Your Honors. May it please the court. Benjamin Alley for the appellees. Yankwood LLP. I'll turn directly to some of the points, Your Honors, asking your questions to the appellant. So firstly, a question was put to appellant about who was on the open phone line. We're, of course, on a motion to dismiss. We're on the allegations here. These are not facts that have been litigated yet. But the allegations actually are that the meeting was not open. It was not an open phone line. All right, but even if assuming it's only people in the organization, even on the open phone line, let's assume that. It's a motion to dismiss. So the question is, at this stage of the litigation, for you to prevail, I think, it would have to be a matter of New York law that if everybody is part of an organization, no matter how big that organization is, as a matter of law, the common interest privilege applies. I think in your brief you said it's irrelevant how many people there are. I'm not aware of a New York case, you can correct me if I'm wrong, that has said that it's irrelevant how many people are on that line and whether it's necessary to make that communication to all of those people. So are you arguing that it's irrelevant how many people are on that line? Your Honor. Under New York law? Firstly, I have a few things to say about that. Firstly, there are no cases that support even the application of excessive publication in any way that appellants advocate. The case law does, in the briefs, talk about, in many of them, the narrowness. It was the people who had the communication had a direct interest in knowing or a legitimate interest in knowing. So there's no fact pattern exactly like we have here. But there is certainly a suggestion that simply being a member of the organization doesn't per se mean that whatever communication is going through the organization, everybody has a right that it wouldn't be excessive to publish something potentially defamatory to every person in the organization. He used the example in the brief, and I'm curious what your response is to this. Suppose there was misconduct in a Boy Scout troop in New York, alleged misconduct, and the Boy Scouts of America had a policy of distributing that nationwide to every member of the Boy Scouts, anywhere in the United States, because they think everybody should know if there's an allegation of some type of sexual impropriety anywhere, everybody should know. Does that mean under New York law, because everybody is in the Boy Scouts of America, that on a motion to dismiss, game over? No, Your Honor, it doesn't mean that. So I don't know here whether or not all of these teachers had a sufficient interest that they should be aware of this alleged misconduct. How do we know that? Yes, Your Honor. So again, it's a complaint, but there are documents attached to the complaint. One of them is an email from one of the plaintiffs, Jamie Hodges, in advance of the events that took place. Plaintiffs rely on that email in their complaint. It is the beginning of the sequence of events alleged in the case. It's at the joint appendix at page 55. The plaintiff emails Mr. Early, a defendant, who's the regional director for Mid-Atlantic Teachers. The plaintiff indicates, it was great to meet you. I am so excited to offer this, this is a camp he's going to run, for the dancers of the Mid-Atlantic region. That's Mid-Atlantic Teachers. That's in the complaint. That's attached to the complaint. Were there any people on any phone call or receiving any statements beyond Mid-Atlantic, or was it only Mid-Atlantic? Only Mid-Atlantic. And again, we're on the allegations, that's in the complaint. It's only Mid-Atlantic Teachers. They are present, it's at a hotel in New Jersey. But then there is a phone line, for sure, Your Honor. But it's not an open phone line that anyone could just dial in. It's only for the members of Mid-Atlantic Teachers. Where is this camp located? The one that he was going to do in the summer. Is that in the complaint? I don't know if there's an allegation of that. Let's suppose it's in New York, okay? And suppose discovery showed that there was no chance, no reasonable chance that anybody from Delaware or some other state that was part of the Mid-Atlantic region would possibly go to that camp. Wouldn't that change, potentially, whether or not it was necessary to do this at that meeting to everybody, or that wouldn't matter? Well, Your Honor, respectfully, that's speculating about discovery. That would be contrary to the allegations in the case. The plaintiff himself sought out Mid-Atlantic Teachers, full stop Mid-Atlantic Teachers, for purposes of approval for his camp or for notification about his camp. Getting approval for the camp is different than who the people who go to the camp are, right? Maybe you have to get approval from the organization to have the camp, but that doesn't necessarily mean that kids from all different states are going to go to that camp, right? That, Your Honor, any outcome of discovery on that question, Your Honor, I would submit, brings the case nowhere near an excessive publication exception to the common interest privilege. So the publication, excessive publication exception, is in the restatement second of torts. It comes from a predecessor case, 1941, a case involving a teamster who had a disciplinary allegation. That is then put into the Teamsters Magazine that goes to 400,000 members and 1,200 others. This is in our brief below, which is in the joint appendix. That was found to be with not excessive publication. The restatement then indicates if there is a communication made to members and not, to those within the common interest. Let's go back to my original question. You said, no, we're not saying that. It seems to me you are saying that if they're a member of the organization, no matter how big that organization is, including the Boy Scouts of America, the common interest privilege applies as a matter of law under New York law. And I'm a little troubled by that because I don't see New York law saying that. I saw your cite to the 1938 case in that restatement. But I can't find any New York case that says, as long as it's within whatever the organization is, whether it be an employer. There are cases, I actually looked around the country, there are cases that say communicating misconduct to employees within the same organization, to all of them, could be excessive publication that you don't necessarily have to tell every employee when there's an allegation of misconduct. So- The limiting principle is the common interest, not necessarily membership in particular organizations. Right, and I'm looking at the complaint here, paragraph 86. This is the complaint. Included among those attendees at the meeting, this is the January 26th meeting, were dozens of colleagues of Plaintiff Hodges, who had worked with Hodges during his many successful Irish dance performances and teaching career. In addition, Mr. Hodges was known by nearly every attendee, this is Mr. Hodges' complaint, was known by nearly every attendee at the January 26th meeting, by virtue of Mr. Hodges attending various events at many of their dance schools. Paragraph 87, as an Irish dance instructor, Mr. Hodges' livelihood and reputation depended upon these individuals working with him in the future. Defendants knew of Mr. Hodges' essential connections to the dozens of attendees at the January 26th meeting. Now, I don't see anything in the complaint that talks about the possibility of distributions beyond people who would be interested because they were potential people who were going to be doing business with Mr. Hodges or were unknown to him. Your Honor, so I want to say a few things about that. So that is absolutely correct. There is a correspondence between the folks who were at the meeting and the common interest here. These are people who teach children Irish dance in the mid-Atlantic region, which is a series of about four states here. Those are folks who have an interest not only in this precise type of complaint because it involves the safety of the children in their charge, but also in just complaints generally made to the leadership of their organization. And tying that back, Your Honor, Judge Bianco, to your question, I want to be very precise about our position on this. Firstly, the court does not need to take on, does not need to hold in order to affirm that it is irrelevant how many members an organization has. Nor does the court need to take on the hypotheticals that was, Your Honor, articulated. There are several offered by appellant in this case. What I want to point out, however, is there is no law supporting any distinction between a small organization and its members and a large one for purposes of the application of the common interest privilege. And it is easy to find cases supporting or cases that are exemplary of large groups of people receiving communications within the common interest. The restatement is one. There's the Fuji case in district court of one that went to all employees. All right. The malice issue, you want to address that briefly? I do, Your Honor. Your Honor inquired of appellant's counsel about malice. And I thought it was noteworthy and wanted to respond that the answer was not responsive. So the allegations of common law, excuse me, of malice of the kind where there's an awareness of the falsity of the allegations, a purposefulness about publishing something false, are completely insufficient and conclusory. Plaintiffs attempt to rely on two investigations by others, one by an international arm for Irish dance folks, and plaintiffs allege that defendants knew it was true that that was closed. But when you look at the other documents attached to plaintiff's complaint, you see that there's a communication. I see my time has expired, and I'll just conclude this answer, Your Honor. There's a communication from that arm that said we can't investigate any further. This person is not a member. No inference could be drawn about what's in the heads of the defendants about the veracity of the complaint from that. What about this issue regarding the minutes? It does appear that in the minutes it suggests, in the meeting, it was suggested that there was a report made to the police, and that it was, obviously the implication was that it was an ongoing investigation. And then the minutes say that it was stated during the meeting that the investigation was closed, the criminal investigation was closed. What's your response to that? Yes, Your Honor. So two things. I'll say as swiftly as I can about that, Your Honor. So firstly, that is not responsive to the malice inquiry. The allegation meant to support or not be conclusory about malice is that the defendants knew what they were saying was false because they reported it to law enforcement, which if you stop there, that's inconsistent with that point. But okay, they reported it to law enforcement. They were aware that law enforcement concluded their investigation with no finding of criminality. That doesn't tell you anything about what is in the defendants' heads about the complaint. With malice, you can put together different things. I understand that's a valid point, but if you go through all the things that they're trying to put together on malice, they first suggest that your clients had a financial interest in his camp failing because they had an association with other camps. One was a judge. The other had another camp that he was associated with. So they allege a financial reason to have this camp fail. They do allege that the two investigations were closed, and then they allege this part about the minutes. So the inference I think they want to be drawn from that is that they didn't want this camp to do well because they were associated with other camps. And by leaving out the fact that the criminal investigation was closed, that would make it more likely that that camp would fail. So why can't you put those things together and try to make that inference? Your Honor, the answer to that is the court requires, even at the pleading stage, more. Why would you doctor the minutes, then? What's the reason for doctoring the minutes? So I must say, just to be clear, there's no concession about doctoring the minutes. Let me ask you a more direct question, then. In the meeting, there's a recording of the meeting. Was it stated that the criminal investigation was closed or not? Well, Your Honor, I think an inference can be drawn about the strength or lack thereof of the case. The plaintiffs cite a recording of the meeting. They claim to have a recording of the meeting, even though the minutes, it began with an instruction not to record it. Is that a part of the record? Yes. Yes, Your Honor. That's at page 74 of the joint appendix. It begins, don't record this. We want to have an open discussion. That's defendant Labus. Plaintiffs, in at least a dozen allegations in their complaint, claim to have a recording of the meeting. We asked for a copy of that, and that was declined. I was just asking, there's no copy of the recording in the record? Correct. That's what I was asking. You haven't heard the recording? No. No. Plaintiffs claim to have it and that you'd be relying on it in their allegations, including for their allegation that during the entirety of the meeting, there's an absence of a statement that, Your Honor, Judge Bianco, you're referring to, that then appears in the minutes about law enforcement closing their investigation. So we have no ability to test that. We asked for the recording so we could see. Maybe that was said somewhere, or maybe it was said and it's hard to hear. But we're on the pleading stage. Are we supposed to accept that as true at this point? Even if they didn't provide you with the recording, they've alleged that this is what happened at the meeting and this is what the minutes say, which is inconsistent with the meeting. Don't we have to? We must accept that as true. Were it so that the meeting minutes were altered to include that the criminal investigation was closed, I submit that would not bear on malice at all. It would certainly not give otherwise conclusory allegations enough support to rise to the level where they overcome this motion. Your Honor, I'm past my time, but the issue of malice, it is not one that the court should take lightly at the pleading stage because this is a privilege. It's a common interest privilege. It applies to a nonprofit group, a nonprofit entity here, its volunteer director and its counsel that were reporting to membership on a formal complaint of a form of sexual misconduct. All right. Thank you. Thank you, Your Honors. Mr. Finney, you have three minutes in rebuttal. Thank you very much. Judge Walker, I do want to address your concern because I'm very worried about this case distorting defamation law fundamentally. In our pleading, Joint Appendix 33, Paragraph 85, we alleged that the January 26th 2020 meeting was held at the Marriott Hotel in Saddlebrook, New Jersey, with dozens of attendees also participating by telephone. Part of the law of excessive publication, Judge Walker, is you are supposed to use the communication reasonably and proportionately. Page 7 of our reply group, 7 and 8- Could any of those people that are on the phone, could students from their groups have attended your client's summer camp? Could they? No, because it spans so many states and- I didn't ask that. I asked you, did you preclude them from, did he preclude them from attending that camp? Kids travel long ways to go to good camps. So my question is, could a child from Connecticut, where was your camp held? New Jersey, I believe. All right, could a child from Rochester, New York, attend the camp in New Jersey? If you're asking whether someone can drive, the answer is yes. If they chose to do so, could they attend? If you're asking whether they could travel, the answer is obviously yes. Your complaint pleads that your client has a reputation, is well known among all the teachers in the Mid-Atlantic, let me finish, in the Mid-Atlantic group, and so therefore, might he not have an interest in having all the members of that organization aware of his camp, such that children with means from Rochester, New York, might be able to attend his camp in New Jersey? I think the way you're asking the question, just to make sure I understand it, is it's logically yes, right? Yes, and so those teachers might have an interest with regard to whether that camp was or was not a safe place. Would they not? I want to answer your question without- Excuse me, I would expect you to answer my question. Yes, I'm answering your question. Okay. Under the law of excessive publication, if you reasonably use the communication, if I were the head of the Mid-Atlantic, I would say this. Which schools is he actually teaching at? Where is he actually teaching while we're investigating this? And then maybe the four schools he was teaching at, you called one leader and say, could you ask your girls, did he text them? You would proportionately and reasonably start to talk to the people and investigate, as opposed to just blurting it out. So the common interest is defined by the probability of whether someone would or would not attend. Let me finish. Would or would not attend, as opposed to the fact that they might have an interest in knowing that there might be a school where there might be a problem. Is that it? I think the answer is, on one philosophical view of the law, if you have any interest, conceivable interest, where you might work with the person, you can tell anybody under that theory, which I don't agree with. And another- This is far more particular. This is an organization of which he's a member, that teaches something that he teaches, for which he's alleged that he's well known and that he's participated and been at some of these places throughout the region. So he has a reputation, that's part of his injury, I understand that. So the question is, is it defined by the probability that they might attend, or the fact that because he's well known, people might be interested in knowing whether their children should attend? Your Honor, first I'm not sure that he was a member. I think he had to get approval to be able to do a camp, but I don't even think he was a member. But that's another fact question. Another fact question is, who was on the telephone? Who was invited to be, who was allowed to hear it on the telephone? Did they really, as a matter of fact, did they really try to contact teachers who really might, where he might interact with children? And also, what about timing? Was there a camp actually happening at the time that they made the disclosure? All I'm asking, Your Honor, please, to consider is when you are looking at excessive publication, isn't this more fact intensive than on a 12B6, and that's all I'm asking. I'm not disagreeing with your general questions that maybe someone might- My general questions didn't have a particular viewpoint. I was testing the premise that you were putting out, that's all. The fact that you may, one day, interact with people doesn't mean that on a motion to dismiss, we don't get any discovery about the timing, or whether they thought about any more limited disclosure to more limited teachers. Before the announcement can be made, you're saying then, the defendants need to do their own investigation as to what the likelihood is of an interaction with your client. No, you're trying to pigeonhole me, Your Honor. That's not fair, respectfully. I'm not ruling that as a matter of law, you always have to do an investigation. It depends on the facts. It depends on the facts, Your Honor. If we were to write an opinion in this case, how would we write the opinion in articulating the excessive publication application in this case? And make it law for the circuit. Yeah, well, I had the great pleasure of clerking for the Third Circuit, and I love directing those opinions. And I think this is clearly one that says, it's a question of fact. And there are many facts in a well-played complaint about an open phone line. And also on the malice, the timing, telling him the investigation was closed. We don't want your version, but we're going to run out and tell hundreds of people, not when he's about to interact with young girls. It's not like he's going to the school the next day, Your Honor. There are facts that you could write an opinion that's narrowed, says it's a fact question. There's enough here that there's a fact question, that discovery, and it can get knocked down in summary judgment, Your Honor. Your Honor, it might get knocked down in summary judgment if it's determined that the campus, because he was about to teach with 300 girls the next day, and we had to stop this rapist from being near the girls. And by the way, he never did anything. Why is that relevant? All right. Because he didn't do the- We're not talking about rapists. No, but he- What the facts are. Okay. The point is, his reputation was ruined. Here's the balance in the law. If you allow common interest to say, it could be anybody he works with, so now let everybody say everything. Now all of the parents, if I'm a father, I'm going to say, wait a minute, I don't know if I want him. And that's exactly why we have defamation law. I think we've heard enough. Okay. I think we're done. Okay. So- Thank you, Your Honor. Thank you both, and we have a reserved decision. Have a good day.